IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

---------------------------------------------------x
                                     :

THOMAS DILL, THOMAS R. DILL,     :
AND                                 :            3:12 CV 137 (JBA)
NICHOLAS MELLO              :

                                       :
v.                                      :
                                     :

RON'S GOLF CAR RENTAL, INC.     :        DATE: JANUARY 24, 2013
                                     :
---------------------------------------------------x

<u>RULING ON PLAINTIFFS' APPLICATION FOR PREJUDGMENT REMEDY</u>

On January 31, 2012, plaintiff Thomas Dill ["Dill"], a citizen of Massachusetts, commenced this wrongful termination diversity action defendant Ron's Golf Car Rental, Inc. ["Ron's"], a Connecticut corporation (Dkt. #1), which Complaint was superseded by an Amended Complaint, filed on April 2, 2012, in which plaintiffs Thomas R. Dill and Nicholas Mello ["Mello"] were added.  (Dkt. #20).  In the Amended Complaint, plaintiff Dill alleges wrongful termination under CONN. GEN. STAT. § 31-51q, and in violation of public policy, for complaints made about the improper and hazardous installation of an above-ground gas tank (Counts One-Two); wrongful termination of Thomas R. Dill and Mello under CONN. GEN. STAT. § 31-51q, and in violation of public policy, in retaliation for complaints made by Dill about the improper and hazardous installation of the above-ground gas tank (Counts Three and Four); violation of the covenant of good faith and fair dealing with respect to  Dill (Count Five), and violation of covenant of good faith and fair dealing with respect to Thomas R. Dill and Mello (Count Six).  (Id.).  On March 19, 2012, and January 8, 2013, defendant filed its Answers. (Dkts. ##13, 29).

On October 15, 2012, plaintiffs filed the pending Motion for Prejudgment Remedy

(Dkt. #21),[1] which motion was referred to this Magistrate Judge from United States District Judge Janet Bond Arterton the next day.  (Dkt. #22).[2]  The evidentiary hearing on plaintiffs' PJR Motion was held on January 10, 2013, at which the three plaintiffs testified, and Nicholas Carlo, Thomas Barber, and Douglas Willey testified for defendant.  (Dkts. #30-31).[3]

For the reasons stated below, plaintiffs' Motion for Prejudgment Remedy (Dkt. #21) is granted in the amount of $59,292 ($41,225 for plaintiff Thomas Dill, $6,655 for plaintiff Thomas R. Dill, and $11,712 for plaintiff Nicholas Mello).

## I. DISCUSSION

### A. FACTUAL BACKGROUND

Plaintiff Thomas Dill began employment with defendant, located in Vernon, Connecticut, as a commercial truck driver in approximately May 2006; plaintiff Thomas R. Dill is Dill's son, and plaintiff's Mello is Dill's nephew.[4]  Defendant was formed by Nicholas Carlo, who owned three auto parts stores, starting when he was twenty-four or twenty-five years old; he was in the auto parts business from 1954 until 1985, at which time he retired.  In 1969, Carlo began his golf cart business, and in 1985 or 1986, sold one segment of the business, which became Ron's Golf Car Rental, Inc., to his son-in-law, Ronald Joppru

---

[1]Attached to plaintiffs' Motion is an affidavit of Thomas Dill, sworn to October 5, 2012, which affidavit was also marked as Exh. 6.

There was some deviation between plaintiff Dills' testimony in open court and this affidavit. See note 14 infra.

[2]The hearing originally was scheduled for December 11, 2012, but was postponed because at the request of counsel, this case was referred to a special master for a settlement conference on December 20, 2012.  (Dkts. ##23-27).  That conference was not successful, and the hearing was rescheduled for January 10, 2013.  (Dkt. #28).

[3]Exhs. 1-8 were admitted in full for plaintiffs, and Exhs. A-F were admitted in full for defendant.

[4]See also Exh. 6 ¶¶ 3-5.

2

["Joppru"].  Joppru is married to Carlo's oldest daughter, Kathleen Joppru.[5]  Carlo is the owner of the property in Vernon on which Ron's is located, consisting of four-and-one-half acres and a 30,000 square foot building; a power line runs through the parcel, and two to three acres are utilized as a parking lot for the golf carts.  As of 2011, Ron's owned approximately four hundred golf carts.  When the business began, its primary customers were country clubs.  However, as Carlo explained, the business began to expand when Henry Kissinger and Anwar Sadat visited the Rockefeller Estate, and eight golf carts were ordered to carry the dignitaries around the estate. This sparked Carlo's marketing interest in using golf carts as transportation in non-golf events and shortly thereafter he ordered twenty more golf carts for this purpose.  These non-golf events are now approximately sixty to eighty percent of Ron's business, such as commencement exercises (including those at University of Hartford, Yale University and the Coast Guard Academy), country fairs, horse shows, and weddings.

The business is seasonal, open generally from mid-April until mid-October or November. Plaintiff Dill's responsibilities included washing, cleaning, and gassing the golf carts, as well as loading them onto defendant's tractor trailer, and then delivering the golf carts to Ron's customers, located in Connecticut, New York, New Jersey, Massachusetts, and Vermont.  Plaintiff Dill resides in Chicopee, Massachusetts, and would store the tractor trailer at a commercial location in his town each night.   Plaintiff Thomas R. Dill started work as a repair person in June 2006, until he was promoted to a truck driver in June 2011, at which

---

[5]Carlo testified that Joppru had served in Vietnam.  After the war, both he and his twin brother became truck drivers, but his brother was killed in a motor vehicle accident.  The couple met on the highway in Minnesota when Kathleen Joppru's car broke down and Joppru stopped to assist her.

time plaintiff Mello replaced his cousin as the repair person.[6]

Plaintiff Dill had a "great relationship" with Joppru, who treated plaintiff Dill "like a brother."[7]  Kathleen Joppru agreed that plaintiff Dill was "a seasoned and valued employee" who was essential for Ron's during the business' "busiest time of the year[.]" (Exh. 3, at 3). During August 2011, plaintiff Dill and the other employees of Ron's noticed a dramatic change in Joppru's behavior, in that he was not "thinking rationally," resulting in plaintiff Dill and others "coax[ing]" Joppru into being escorted by his family on August 15, 2011 to a doctor's office, who in turn admitted him to the hospital, where he eventually was diagnosed with bipolar disorder; Joppru never returned to his business again, as he can no longer do so, and instead resides with his wife in Florida, where he still undergoing psychiatric treatment every other week.   On August 26, 2011, Kathleen Joppru was appointed conservator for her husband and his estate by the local Probate Court.  (Exh. F).

Upon Joppru's hospitalization, Carlo, who is a resident of Florida and spends six months there, stepped in to run the business.  Carlo also became concerned about his son-in-law's mental health during the summer of 2011, noticing that Joppru was turning into someone "altogether different."  The first incident occurred when Joppru announced that he was going to knock down and relocate part of a two-story building on the property, in which Carlo has tenants other than Ron's.  Carlo informed Joppru that he needed permits to do such work and Joppru responded that was not necessary.[8]  Next, on August 13, 2011 (the

---

[6]See id. ¶ 5.

[7]During cross-examination, plaintiff Dill acknowledged that in May 2011, Joppru had loaned him $1800, which plaintiff Dill had repaid, although he did not remember when.

[8]This conversation is ironic in light of plaintiff Dill's discussions with Carlo about the gas storage tank, addressed below.

Saturday before August 15), Joppru had arranged to deliver ten golf carts to the Candlewood Valley golf tournament by 8:00 a.m., but he just left the business at that time. At 8:10 a.m., someone from the tournament called to complain and cancelled the order when he or she learned that Joppru had just started the trip.  After Joppru returned to Ron's to unload the golf carts, he was angry about the cancellation, and he then picked up a thirty-gallon bucket used to catch water leaking from his air conditioning unit, threw the bucket against the wall, and yelled "the hell with it."  Carlo testified that this behavior "was not like him."  Lastly, Carlo testified that Joppru was "very conservative" when it came to finances, would only replace motor vehicles when necessary, and he did not like to discuss money; during that summer, he often raised the topic of finances, ran up credit card debt, owed money to vendors, and purchased five GMC pickup trucks.  Carlo was present when Joppru and plaintiff Dill were looking through the Yellow Pages to find a psychiatrist for Joppru; Carlo's wife already had a scheduled appointment with her own physician at 11:00 a.m. that day, and she relinquished that appointment to Joppru, after which Joppru was admitted to the psychiatric ward of Manchester Hospital.

Plaintiffs Dill, Thomas R. Dill, and Mello all testified that sometime before early August 2011, they experienced difficulties with the upper right windshield separating from the frame of the tractor trailer. Plaintiffs Dill and Mello further testified that during a trip back from the Rhode Island shoreline in early August 2011, the windshield started to shake and they could feel the wind, for which plaintiff Mello supported the windshield with his feet, and they unsuccessfully tried to fix it themselves with a screwdriver[9]; the windshield had been temporarily repaired on August 9 by Bell Glass; plaintiff Dill tried to set up another

---

[9]Plaintiff Mello testified that his last trip in the tractor trailer was the one from Rhode Island.

appointment with Bell Glass on August 17, but the truck was not available; and on August 24, 2011, the upper right corner of the wind shield had popped out again as plaintiff Dill was leaving I-90 East in Stockbridge, Massachusetts.  As a result, on August 25, 2011, plaintiff Dill did not drive the tractor trailer to work as usual, leaving it behind in Chicopee to be repaired up there; plaintiff Mello described the windshield as "unsafe" and "ready to fall out[,]" so as a result, plaintiffs drove to work in plaintiff Dill's personal vehicle instead.  (See also Exh. 8).

Plaintiff Dill testified that when he arrived at work the next day, on August 25, 2011, at about 7:00 a.m., he noticed a large above-ground gas tank had been installed, so that the golf cars would be gassed from this large tank, instead of using the dozens of smaller five to six gallon gas tanks that would be brought back and forth from a nearby gas station.  (See Exhs. D-E).  He noticed several safety concerns about this gas tank, including that there was no fence around it, there were no safety signs, there was no fire extinguisher nearby, the gas tank was being operated by jumper cables attached to a car battery on the ground, and the gas tank was close to an open stream.   Plaintiff Dill is "very sensitive" to fire issues, in that his son was severely burned in February 2002, for which he received second degree burns and has undergone up to thirty surgical procedures on his face.[10]  (See also Exh. 1).  In plaintiff Dill's opinion, the large gas tank was no safer than using the smaller five to six gallon gas tanks [11]; however, he added that he would have had "no concerns" about the large gas tank as long as it had been installed properly.

---

[10]See also id. ¶¶ 7-8.

[11]In contrast, Thomas Barber and Douglas Willey, who are employees at Ron's, both testified that they greatly preferred the large gas tank to the smaller ones, because it eliminated "safety" concerns in transporting twenty-two smaller ones back and forth from the gas station in the bay of a pick up truck.

Plaintiff Dill then approached Carlo, to inquire if he had obtained the proper permits for the installation of a gas tank, to which Carlo responded that he did not need a permit as he owned the building. Plaintiff Dill thereupon called the Vernon Police Department to report that a gas tank had been illegally and improperly installed.  Shortly thereafter, a police officer from the Vernon Police Department arrived, spoke first with Carlo, next  spoke by telephone with Kathleen Joppru, and then asked plaintiff Dill for his driver's license.  After reviewing the driver's license and returning it to plaintiff Dill, the police officer then instructed plaintiff Dill that Kathleen Joppru wanted all three plaintiffs off the property.  Plaintiff Dill then explained his concerns about the gas tank to the Vernon police officer, and requested that the police officer to contact the Vernon Fire Marshal.   Plaintiffs left the premises as requested.[12] Plaintiff Dill testified that the Vernon Police Officer had "no interest in what [plaintiff Dill] had to say[,]" focusing solely on what Carlo had told him in person and what Kathleen Joppru had told him during their telephone conversation.   Plaintiffs Thomas R. Dill and Mello both testified that they had no interactions whatsoever that day with either Carlo or Kathleen Joppru.

When he arrived home, plaintiff Dill telephoned the Connecticut Department of Environmental Protection, which inspected the gas tank and found no violation; plaintiff Dill admitted that he possibly might have called OSHA that day as well.

Later that day, plaintiff Dill also telephoned Kathleen Joppru about the incident and when they could return to work, during which conversation plaintiffs learned that "we apparently [had] quit."[13]  Ron's also sent two new drivers to remove the tractor trailer from

---

[12]See also id. ¶¶ 9-17.

[13]See also id. ¶¶ 18-19.

Chicopee and return it to Vernon.[14]

Upon cross-examination, plaintiff Dill conceded that when he first arrived at work on August 25, 2011, Carlo immediately presented him with a memorandum to him from Kathleen Joppru, dated the previous day, which read in relevant part:

> I received a call from Marge Lappen of Your Business Office regarding your [p]ay rate at Ron's Golf Car.  If you have something in writing from Ron on the pay you are requesting please submit it to me so I can get it over to Marge.  Otherwise your rate of pay will be the same as you received this week.
>
> As you know, Ron is currently in the Behavioral Unit of ECHN's Manchester Hospital under psychiatric care. In the interim, my father Nick Carlo has been helping out at Ron's at my request and with my authorization.
>
> . . .
>
> Thank you for your help and cooperation during these difficult times.
>
> If you have any questions or concerns please do not hesitate to call me . . . .

(Exh. 5).   Plaintiff Dill emphasized that the memorandum did not terminate plaintiff Dill's employment and that he intended to keep on working. Plaintiff Dill testified that he did not discuss wages with Carlo, that he was not asked to sign the memorandum, that he did not rip the memorandum up, and that he never said that he would not return the tractor trailer until this issue regarding wages was resolved.  He categorically denied that he had used his concerns over the gas tank as "leverage" for his dispute over his wages.

This testimony, however, was inconsistent with plaintiff Dill's "Fact Finding Report – Claimant Statement," dated September 23, 2011, which swore under oath that plaintiff's "last

---

[14]On cross-examination, Carlo conceded that contrary to written representations made by Ron's (Exh. 4), these two drivers did not need assistance from the Chicopee Police Department.

As is abundantly clear, almost all the written statements made by the parties contain at least some misstatements.

day of work was August 24, 2011[,]" in that he "was terminated for not signing a piece of paper." (Exh. C).   In this statement, plaintiff Dill averred that on either August 22 or 23, 2011, he complained to Lappen that his August 22 paycheck was "$400.00 short[]" because Joppru had raised his salary to $1500/week, but that Lappen had responded that Carlo had instructed her not to "cut" the check until the next day. (Id.).  Plaintiff Dill further swore that he had "refused to sign the letter." (Id.).  On cross-examination, plaintiff Dill acknowledged that he had called Lappen after receiving the August 22, 2011 paycheck, to inquire why he was being paid at a rate of $20/hour, instead of $1500/week, as promised by Joppru.   Upon cross-examination, plaintiff Dill further testified that plaintiffs resented being "treated like disgruntled employees," that he had not initiated any discussion about wages with Carlo and Kathleen Joppru but rather they had brought up the topic, and that he never had been asked if he was wiling to return to wages of $18.50/hour.

During cross-examination, plaintiff Dill also described as "inaccurate" the Case/Incident Report of the Vernon Police Department, dated August 25, 2011, which indicated that Carlo had "cut" the pay of all three plaintiffs, who "were not willing to work for the new pay rate and planned on leaving[,]" and that "[p]rior to leaving," plaintiff Dill then complained about the gas tank, whereupon Police Officer Danny J. Macaulay instructed Carlo to drain the tank until it is inspected by the Vernon Fire Marshall "in the future." (Exh. B).  The Case/Incident Report further indicates that Police Officer Macaulay contacted the Fire Marshal to inform that office about the gas storage tank. (Id.).[15]

Plaintiff Dill also disputed a letter sent to him by Kathleen Joppru, dated September

---

[15]Attached to the report is an addendum, dated September 8, 2011, that plaintiff Dill had left a voice message for Police Officer Macaulay the previous day to complain that the report was "inaccurate[]"; the police officer returned the phone call on September 8 and advised plaintiff Dill that he "would not modify the report." (Id.)

7, 2011, in response to plaintiff's claim for unemployment compensation, in which Kathleen Joppru recounted that plaintiff Dill had told Lappen on August 24, 2011 that plaintiff Dill was refusing to move the tractor trailer from Chicopee unless the three plaintiffs received a higher rate of pay, requiring Ron's employees to be escorted by Chicopee Police Officers to plaintiff Dill's home to retrieve the equipment.  (See Exh. 4).[16]

Not surprisingly, Carlo's recollection of the events of late August 2011 was markedly different from that of plaintiff Dill.  Carlo testified that plaintiff Dill previously had asked to meet with Carlo, and the two of them sat in a golf car, where plaintiff Dill advised Carlo that Joppru had promised him wages of $20/hour and a $4,000 bonus at the end of the season. Unbeknownst to plaintiff Dill, Carlo had to put $3,000 of his own money into the business in order to cover payroll that week, as Ron's was out of money.  During his tenure, Carlo learned that Joppru had made similar promises to other employees as well; after consulting with his daughter about this dilemma, they decide to roll back all employees to their wages as of August 1, 2011, which is why they prepared the written notice given to their employees, although he acknowledged on cross-examination that the form itself was missing a designated place for an employee to sign it.  (See Exh. 5).  Carlo further testified that he needed all his truck drivers because September is "one of our busiest months[,]" and they needed to transport ninety golf carts to various events, including University of Connecticut football games, a country fair in Vermont, and country clubs.   Like his daughter, Carlo agreed that plaintiff Dill "definitely was a good truck driver" who was "definitely critical" to the successful operation of the business; Carlo also appreciated that plaintiff Dill was a "very

---

[16]Plaintiff Dill pointed out some statements in Exhs. 3-4 were contradicted by Carlo's statements in the "Fact-Finding Report-Employer Statement," dated September 23, 2011 (Exh. 2).

good friend" to his son-in-law.

Carlo further testified that on August 25, 2011, plaintiff Dill drove his own automobile to Ron's, taking his son and nephew with him.  Plaintiff Dill went into Carlo's office, where Carlo advised plaintiff Dill that the payroll was reverting back to the previous wages on August 1, 2011, and he gave plaintiff Dill his daughter's memorandum to sign.   Carlo testified that plaintiff Dill picked up the memorandum and ripped it up, yelling, "F___ Kathy and you don't belong here."  Carlo responded, "I own the building[,]" to which plaintiff remarked, "You don't own the building.  Kathy does."  Carlo testified that plaintiff Dill never mentioned the gas tank, which had been delivered two days earlier, he did not say anything about his wages, and he never mentioned the windshield problems with the tractor trailer.  Carlo further testified that plaintiff Dill then called the Vernon Police Department, and after the police officer arrived, plaintiff Dill just "walked out the door."  Carlo considered this to be the end of their relationship, plaintiff Dill never apologized to Carlo, and he never acknowledged the poor financial condition that Carlo inherited from his son-in-law.  In Carlo's view, plaintiffs' dispute with him only concerned wages, not the gas tank, and none of the plaintiffs expressed any interest in returning to work at their prior hourly rate.  Carlo emphasized that the business could not survive if its employees had received the higher wages promised by Joppru before his breakdown.  Carlo had hoped that all three plaintiffs would continue to work at Ron's at their hourly rates as of August 1, 2011, and he did not consider the August 24, 2011 memorandum to be a termination letter, nor did he tell them that they would no longer employed by Ron's.  While Carlo preferred to have plaintiff Dill as a truck driver, after he did not return to work, Carlo was forced to hire three new drivers.

Carlo further testified that a representative from DEP arrived at Ron's during the

11

afternoon of August 25, 2011 to inspect the gas tank; this DEP employee took photographs of the tank and his only suggestion was to place Speedy Dry under the tank in case there was a spill.   Sometime around or shortly before October 20, 2011, plaintiff Dill contacted the Vernon Fire Marshal, who may not have been informed of the situation by the Vernon police officer responding to plaintiff Dill's August 25, 2011 telephone call.  William Call, Deputy Fire Marshal, inspected the premises on October 20, 2011, instructing Carlo to "[p]lease" repair the six defects within a week.  (Exh. 1).  This inspection did not occur until October, when Ron's business activities were winding down, and from the Deputy Fire Marshal's comments during the inspection, Carlo did not think he had to implement these changes, which cost less than $200, until the next season.  Carlo testified that he had been unaware of any of these requirements prior to this inspection.  Carlo's impression from this inspection was that the Fire Marshal had no safety concerns about the tank and did not expect any of these changes were necessary until spring 2012, even though the October 20, 2011 letter to him indicated that these six items required "immediate attention."  (Exh. 1).

Carlo acknowledged that he fought plaintiff Dill's claim for unemployment compensation for about a year, because resignation is usually a basis for denying such claims. He could not explain, however, why certain critical facts were omitted from defendant's multiple submissions (see Exhs. 2-4), although he explained that he never told his daughter about what plaintiff Dill had said about her, because he obviously did not want to upset her further.   At some point, Carlo realized that there was no "financial" gain to keep fighting plaintiff Dill with regard to his unemployment compensation claim, because Ron's already was paying the "highest rate" for such claims.

Two of Ron's employees also testified at the PJR hearing.   Tom Barber has been

employed at Ron's since 1992, handling all matters except truck driving, such as booking, billing, gassing the golf carts, and mechanical work on them.  He has know Joppru since 1989-90, has known plaintiff Dill for about six or seven years, and thinks both of them are "great."  Barber was one of the employees, who like plaintiff Dill, helped Joppru receive medical assistance.

Barber was employed at Ron's during the summer of 2011, mainly doing mechanical work and small deliveries.[17]  Like everyone else at Ron's, Barber also noticed a change in Joppru's behavior, particularly because Joppru was "normally cheap[,]" but now he started to "spend[] money like it was going out of style."  Like he did for the plaintiffs, Joppru increased Barber's hourly wages from $17.50/hour, which he had earned for the previous two years, to $25/hour, a rate that "didn't make any sense" to Barber.  After one paycheck at the higher rate, Barber's hourly rate was reduced to $17/hour, which Barber agreed to, as he recognized that Joppru "was going nuts" and there was "no way" Ron's could afford to pay him the higher wages.  Barber testified that prior to August 25, 2011, plaintiff Dill was "very vocal" about his objection to the reduction in wages,  that plaintiff Dill considered Carlo and Kathleen Joppru to be attempting a "hostile takeover" of Ron's, and that plaintiff Dill said that he would quit if he did not receive $1500/week.

Similarly, Doug Willey worked at Ron's for six seasons, from April-May through October, although he has been a friend of Joppru prior to them.[18]  During June 2011, he helped the truck drivers and he would deliver the golf carts in small trucks.  During the

---

[17]Barber was not present on August 25, 2011 during the confrontation between plaintiff Dill and Carlo, as he was "pulling in[to]" Ron's parking lot while the police officer was "pulling out."

[18]Willey has been employed in a variety of fields: as a retail broker for Merrill Lynch, with a business that made videos, a construction company, a personal care business, and as a substitute teacher.

course of his employment, his hourly rates increased from $10/hour to $15/hour, with the higher wages when he drove a truck.  He also noticed that Joppru was "not in a stable condition[,]" made inconsistent statements, and made lots of promises that Willey did not take "seriously," including raising Willey's hourly rates from $20/hour to $25/hour, which Willey recognized was "not viable."   Willey did not consider his raise to be "reasonable[,]" he had "no expectation" that it would continue, he understood and agreed when Carlo and Kathleen Joppru asked him to roll back his wages, and he recognized that Ron's "absolutely could not continue to survive" at these higher wages.[19]

With respect to damages, plaintiff Dill testified that he had been earning $18.50/hour, plus $50/week in gas allowance, and a $4,000 bonus at the end of each season; he testified that he generally worked five to six days a week, for a total of fifty-five to sixty hours. Plaintiff Dill agreed that his W-2 Wages and Tax Statements for 2009, 2010 and 2011 all reflect wages at $18.50/hour. (Exh. A). Plaintiffs testified that plaintiff Dill usually worked thirty-eight weeks/year, whereas plaintiff Thomas R. Dill generally worked twenty-eight weeks/year; plaintiff Mello only worked five weeks in 2011.  On August 2, 2011, as Joppru's mental condition was beginning to deteriorate, he terminated one other truck driver, so that plaintiff Dill became the only Class A truck driver at Ron's; he testified that as a result, Joppru raised his wages to $1500/week, making him a salaried employee because he was now doing the work of two people.  Plaintiff Dill testified that with overtime, however, even at $20/hour, he generally earned $1500/week even as an hourly employee.  Employees at Ron's were paid on Mondays, and his paycheck for August 22, 2011 indicated that he was being paid $20/hour.  His last paycheck from Ron's was one week later, on August 29, 2011.

---

[19]Willey also did not witness the incident on August 25, 2011; although he worked that day, he assumes that he was out "on a delivery" when the dispute took place.

Plaintiff Dill further testified that he has never refused to return to work, that he has not been able to find substitute employment despite diligent searches through his union, an employment agency, newspapers, and internet searches, that he collected unemployment compensation until mid-January 2013, that he has been hurt "tremendously," and that he has become a "broken man."

Plaintiff Dill claims lost wages of $81,275.00 ($1,500/week from August 24, 2011 to December 7, 2011 and again from April 16, 2012 through December 7, 2012, plus two year end bonuses), minus $11,925 in unemployment compensation, plus $104,150 in future lost wages for two more years, including $8,000 in year end bonuses for two years, and $6,750 in attorney's fees and costs, for a total of $190,250.  (See also Exh. 7, Schedule A; Exh. A).[20] On recross-examination, he conceded that he had received only one paycheck in the amount of $1,500.

Plaintiff Thomas R. Dill testified that he had been paid $10/hour during 2010, and that his hourly wages increased to $11/hour when he became a truck driver in June 2011. Like his father, Joppru had raised his wages to $16/hour in August 2011, and he received only one pay check at the rate.   He claims lost wages of $49,296.00 ($16/hour for 14.85 weeks from August 25 through December 7, 2011 and for thirty-four weeks from April 16, 2012 to December 7, 2012, plus $2,400 in year end bonuses for two years, minus $12,805 in unemployment compensation, plus $50,638 in future wages for the next two years, for a total of $99,934.00.  (See also Exh. 7, Schedule B; Exh. A).[21]

Plaintiff Mello testified that he was paid $10/hour, he also was given a raise of

---

[20]See also Exh. 6, ¶ 20.

[21]See also id., ¶ 21.

$16/hour, but he would have "no problem" with  compensation at the lower rate.  Although he testified that he did not know if his damages calculations were made at an hourly rate of $10/hour or $16/hour, the numbers are virtually identical to those of plaintiff Thomas R. Dill, so they obviously were calculated with the higher rate.  He claims lost wages of $48,496.00 ($16/hour for 14.85 weeks from August 25 through December 7, 2011 and for thirty-four weeks from April 16, 2012 to December 7, 2012, plus $1,600 in year end bonuses for two years, minus $5,088.00 in unemployment compensation, plus $55,360.00 in future wages for the next two years, for a total of $103,856.00  (See also Exh. 7, Schedule C; Exh. A).[22] He testified that he has been looking for new employment by looking online and in newspapers, and by "helping friends out" with snow removal and/or yard work, for which he has earned approximately $4,200.[23]

### B. LEGAL STANDARD FOR A PREJUDGMENT REMEDY

A prejudgment remedy "is generally intended to secure the satisfaction of a judgment should plaintiff prevail."  Cendant Corp. v. Shelton, No. 3:06 CV 854 (JCH), 2007 WL 1245310, at *2 (D. Conn. Apr. 30, 2007)(citation omitted).  Federal Rule of Civil Procedure 64 permits a plaintiff to utilize the state prejudgment remedies available to secure a judgment that might ultimately be rendered in an action. See Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers Local No. 70 of Alameda County, 415 U.S. 423, 436 n. 10 (1974).  Pursuant to the Connecticut Prejudgment Remedy statute, CONN.

---

[22]See also id., ¶ 22.

[23]In his affidavit, plaintiff Dill avers that he is aware defendant does not have insurance coverage against the types of acts alleged in the complaint, and based on conversations with other former employees, defendant is suffering financial hardship and is liquidating assets to prevent recovery in this and other lawsuits against it.  (Exh. 6, ¶¶ 23-24).

GEN. STAT. § 52-278d(a), the standard for issuing a prejudgment remedy is probable cause,

so that a prejudgment remedy is appropriate

> [i]f the court, upon consideration of the facts before it and taking into account any defenses, counterclaims or set-offs, claims of exemption and claims of adequate insurance, finds that the [movant] has shown probable cause that such a judgment will be rendered in the matter in the [movant's] favor in the amount of the prejudgment remedy sought . . . .

CONN. GEN STAT. § 52-278d(a).  In the words of now Chief United States District Judge Alvin

W. Thompson:

> The legal idea of probable cause is a bona fide belief in the existence of the facts essential under the law for the action and such as would warrant a man of ordinary caution, prudence and judgment, under the circumstances, in entertaining it. Probable cause is a flexible common sense standard.  It does not demand that a belief be correct or more likely true than false.

Qualitative Reasoning Sys., Inc. v. Computer Scis. Corp., No. 3:98 CV 554 (AWT), 2000 WL

852127, at *10 (D. Conn. Mar. 31, 2000)(internal quotations & multiple citations omitted).

A prejudgment remedy proceeding is "only concerned with whether and to what

extent the plaintiff is entitled to have property of the defendant held in the custody of the

law pending adjudication of the merits of that action."  Benton v. Simpson, 78 Conn. App.

746, 751-52, 829 A.2d 68, 72-73 (App. Ct. 2003)(citation & internal quotations omitted).

Further, while a prejudgment remedy hearing "is not contemplated to be a full scale trial on

the merits of plaintiff's claims," Bank of Boston Conn. v. Schlessinger, 220 Conn. 152, 156

(1991)(multiple citations & internal quotations omitted), a plaintiff is "bound to furnish proof

of his damage with reasonable probability, and not leave the trial court to speculation and

conjecture." Mullai v. Mullai, 1 Conn. App. 93, 95, 468 A.2d 1240, 1242 (App. Ct. 1983)(per

curiam).   After a hearing, the Court must "consider not only the validity of the plaintiff's

claim but also the amount that is being sought." Calfee v. Usman, 224 Conn. 29, 38

(1992)(citation & internal quotations omitted).  Additionally, the Court must "evaluate not only the plaintiff's claim but also any defenses raised by the defendant." Balzer v. Millward, Civ. No. 3:10 CV 1740(SRU)(HBF), 2011 WL 1547211, at *1 (D. Conn. Apr. 21, 2011), quoting Haxhi v. Moss, 25 Conn. App. 16, 20 (1991)(citation omitted).

C. PROBABLE CAUSE

Plaintiff's application for prejudgment relief turns upon whether plaintiff has shown "probable cause" that a judgment will enter in his favor.  CONN. GEN. STAT. § 52-278(d)(a)(1).  "Probable cause"  has been defined by the Connecticut courts as "'a bona fide belief in the existence of the facts essential under the law for the action and such as would warrant a man of ordinary caution, prudence and judgment, under the circumstances, in entertaining it.'" Walpole Woodworkers, Inc. v. Atlas Fencing, Inc., 218 F. Supp. 2d 247, 249 (D. Conn. 2002), quoting Three S. Development Co. v. Santore, 193 Conn. 174, 175, 474 A.2d 795 (1984)(citation omitted).  The standard of "probable cause" is less demanding than the "preponderance of the evidence" or the "likelihood of success" standards.  Cendant Corp., 2007 WL 1245310 at *3.  Plaintiff need not "prove [his] case by a preponderance of the evidence, but must show that there is probable cause to sustain the validity of [his] claim." Walpole Woodworkers, 218 F. Supp. 2d at 249 (citation omitted).

To state a claim under CONN. GEN. STAT. § 31-51q,

> a plaintiff must allege that (1) he was exercising rights protected by the First Amendment to the United States Constitution (or an equivalent provision of the Connecticut Constitution); (2) he was fired on account of his exercise of such rights; and (3) his exercise of his First Amendment rights did not substantially or materially interfere with his bona fide performance or with his working relationship with his employer.

Ridgeway v. Royal Bank of Scotland Group, Civ. Action No. 3:11 CV 976(VLB), 2012 WL 1033532, at *16 (D. Conn. Mar. 27, 2012), quoting D'Angelo v. McGoldrick, 239 Conn. 356,

361 (1996).

In light of the foregoing, at the hearing held before this Magistrate Judge on January 10, 2013, plaintiffs have met the minimal burden of probable cause that they were fired on account of plaintiff Dill's exercise of his rights protected by the First Amendment, or an equivalent provision of the Connecticut Constitution, with respect to the concerns that he raised as to the safety of the new gas tank, and the exercise of his First Amendment rights did not substantially or materially interfere with his <u>bona fide</u> performance or with his working relationship with his employer.[24]   The Deputy Fire Marshal agreed in part with plaintiff's concerns.  (<u>See</u> Exh. 1).  While there is a factual dispute whether plaintiffs were in fact "fired," plaintiffs perceived that they had been terminated, and Carlo and Kathleen Joppru certainly did not make any overtures to plaintiffs to welcome them back.

It appears that both plaintiff Dill and Carlo over-reacted during their dispute early on the morning of August 25, 2011.  Both men understandably were upset and concerned over the disturbing psychiatric decline of Joppru, and perhaps let their emotions get the better of them.  The controversy between them also hinged upon issues that were deeply personal to them – fire safety for plaintiff Dill, in light of his son's tragic accident in February 2002, and for Carlo, the declining financial viability of Ron's, for which Carlo had given $3,000 of his own funds in order to meet payroll that week.   Had cooler minds prevailed, none of this

---

[24]In this PJR context, there is no need to address the impact of First Amendment limitations for public employees in <u>Garcetti v. Ceballos</u>, 547 U.S. 410 (2006), upon private employees under CONN. GEN. STAT. § 31-51q, which in this case means the operative question would be: was plaintiff Dill's questioning about the safety of the gas tank part of his official job duties (which are not protected by the First Amendment) or a matter of public concern (which are so protected).  <u>See Schumann v. Dianon Sys., Inc.</u>, 304 Conn. 484 (2012).  <u>See also Lenox v. Town of North Branford</u>, 08 CV 1448 (DJS), 2012 WL 6102470 (D. Conn. Dec. 7, 2012); <u>Ozols v. Town of Madison</u>, 11 CV 1324 (SRU), 2012 WL 3595130 (D. Conn. Aug. 20, 2012); <u>Reynolds v. Town of Suffield</u>, 10 CV 1528 (JBA), 2012 WL 3135896 (D. Conn. July 31, 2012); <u>Perez-Dickson v. City of Bridgeport</u>, 304 Conn. 483 (2012).

would have occurred.[25]

Accordingly, probable cause exists for the entry of a prejudgment remedy against defendant.

D. DAMAGES

The damages that a plaintiff claims "need not be established with precision but only on the basis of evidence yielding a fair and reasonable estimate." Savalle v. Kobyluck, No. 3:00 CV 675 (WWE), 2001 WL 1913746, at *2 (D. Conn. Sept. 21, 2001)(citations & internal quotations omitted). Plaintiffs seek a prejudgment remedy in the amount of $280,000. (Dkt. #21).

Plaintiffs' damages analysis is far too generous to plaintiffs for at least four reasons. First, plaintiffs' damages have been calculated at the higher rates, which Barber and Willey, (and to some extent Mello), acknowledged were "not reasonable" and were the result of Joppru's emotional decline. Carlo and Barber both testified that Ron's could not afford to pay these employees at the higher wages that Joppru had promised them earlier in August 2011. The increase for plaintiff Dill was not as extreme as those for the other employees, so Joppru's promise may not as appeared to be as fanciful to plaintiff Dill as it did to Barber, Willey and Mello. Thus, for these calculations, plaintiff Dill will be awarded $20/hour, plaintiff Thomas R. Dill at $11/hour, and Mello at $10/hour.

Second, for the 2011 season, plaintiffs seek wages for an additional 14.85 weeks, from August 25, 2011 to December 7, 2011. Plaintiff Dill testified that he worked at Ron's for thirty-eight weeks, and plaintiff Thomas R. Dill and Mello worked for twenty-eight weeks;

---

[25]It is not at all clear that plaintiffs will prevail at trial, when the higher burden of proof, that is preponderance of the evidence, will apply. A reasonable jury could choose to believe defendant's witnesses over the three plaintiffs as easily as it could choose to believe the plaintiffs.

the season generally ended in mid-October to November, not early December.  Thus, for the 2011 season, plaintiffs are entitled only to ten weeks, not 14.85 weeks, from August 25, 2011 to November 4, 2011.

Third, for the 2012 season, consistent with plaintiffs' testimony, plaintiff Dill is entitled to thirty-eight weeks of compensation,[26] while plaintiff Thomas R. Dill and Mello are entitled to twenty-eight weeks.[27]

And last, all three plaintiffs seek future wages for two additional seasons, that is summer 2013 and summer 2014.  While the economy in Connecticut has only begun to rebound, compensating plaintiffs for four full summers appears excessive.

Thus, the Court awards damages as follows:

---

[26]In Exh. 7, he only seeks thirty-four weeks.  (Exh. 7, Schedule A).

[27]Both of these plaintiffs also sought thirty-four weeks.  (Id., Schedules B-C).

| | Plaintiff Dill | Plaintiff Thomas R. Dill | Plaintiff Mello | Subtotals |
|---|---|---|---|---|
| Lost Wages for 2011 | $8,000 | $4,440 | $4,000 | $16,440 |
| Lost Wages for 2012 | $30,400 | $12,320 | $11,200 | $53,920 |
| Year End Bonuses for 2011 and 2011 | $8,000 | $2,400 | $1,600 | $12,000 |
| TOTAL PAST LOST WAGES | $46,400 | $19,160 | $16,800 | $82,360 |
| Mitigation for Unemployment Compensation | $11,925 | $12,805 | $888 | $25,618 |
| Mitigation for New Employment | $0 | $0 | $4,200 | $4,200 |
| TOTAL MITIGATION | $11,925 | $12,805 | $5,088 | $29,818 |
| Attorney's Fees & Costs | $6,750 | $0 | $0 | $6,750 |
| TOTAL DAMAGES | $41,225 | $6,655 | $11,712 | $59,292 |

In this case, plaintiffs have "furnish[ed] proof of [their] damage with reasonable probability." Mullai, 468 A.2d at 1242. While plaintiffs need not establish that the amount of damages with "mathematical precision," Rafferty v. Noto Bros. Construction, LLC, 68 Conn. App. 685, 693, 795 A.2d 1274 (2002)(citation omitted), there must exist some evidence sufficient for the court to make a "fair and reasonable" prediction as to likely damages. Kendall v. Amster, 108 Conn. App. 319, 331, 948 A.2d 1041 (2008)(citation & internal quotations omitted). Accordingly, probable cause exists for the entry of a prejudgment remedy in the amount of $59,292 ($41,225 for plaintiff Thomas Dill, $6,655 for

plaintiff Thomas R. Dill, and $11,712 for plaintiff Nicholas Mello).

## II. CONCLUSION

For the reasons stated above, plaintiffs' Application for Prejudgment Remedy (Dkt. #20) is granted in the amount of $59,292 ($41,225 for plaintiff Thomas Dill, $6,655 for plaintiff Thomas R. Dill, and $11,712 for plaintiff Nicholas Mello).

This is not a Recommended Ruling, but a ruling on a non-dispositive motion,[28] the standard of review of which is specified in 28 U.S.C. § 636; FED. R. CIV. P. 6(a) & 72; and Rule 72.2 of the Local Rules for United States Magistrate Judges.  As such, it is an order of the Court unless reversed or modified by the District Judge upon timely made objection.

See 28 U.S.C. § 636(b)**(written objection to ruling must be filed within fourteen calendar days after service of same)**; FED. R. CIV. P. 6(a) & 72; Rule 72.2 of the Local Rule for United States Magistrate Judges, United States District Court for the District of Connecticut; Small v. Secretary of HHS, 892 F.2d 15, 16 (2d Cir. 1989)**(failure to file timely objection to Magistrate Judge's recommended ruling may preclude further appeal to Second Circuit)**.[29]

---

[28]It has long been the rule in this district that a PJR application is a non-dispositive motion and upon referral to a Magistrate Judge, does not require a recommended ruling.  Aetna Life Ins. Co. v. Tooth Savers Dental Serv., No. 96 CV 102453, 1997 WL 102453 (D. Conn. Feb. 5, 1997). See also Thompson v. Rizzitelli, 10 CV 71 (JBA/MPS), 2011 WL 4899750, at *5, n. 14; Balzer v. Millward, 10 CV 1740 (SRU), 2011 WL 1547211, at *5, n.7 (D. Conn. Apr. 21, 2011); CapitalSource Fin. LLC v. Autorino, 09 CV 2148 (RNC), 2011 WL 1195857, at *1, n.1 ((D. Conn. Mar. 11, 2011); United of Omaha Life Ins. Co. v. Conn. Student Loan Found'n, 718 F. Supp. 2d 277, 286 (D. Conn. 2010).

[29]Given the small amounts of money at stake, which presently do not exceed the $75,000 threshold required by diversity jurisdiction, counsel and the parties are **_strongly_** urged to renew their settlement discussions.  (See Dkt. #27).  If either counsel believes that a settlement conference before this Magistrate Judge would be productive, he should contact Chambers promptly in light of the discovery deadline of March 15, 2013 and summary judgment deadline of April 15, 2013.  (See Dkts. ##32-33).

Dated at New Haven, Connecticut, this 24th day of January, 2013.


   /s/ Joan G. Margolis, USMJ
Joan Glazer Margolis
United States Magistrate Judge